Defendant-Appellant, Kevin B. Yarbrough ("appellant"), appeals his conviction for aggravated murder, a violation of R.C. 2903.01, and appeals his conviction for conspiracy to commit aggravated murder, a violation of R.C. 2923.01.[1]
The facts of the case are as follows. Sometime in the late 1980s, after having been arrested for passing bad checks, Wilma Arnett agreed to become a drug informant for the Shelby County Sheriff's Office. Due to her work as a drug informant, Arnett had become a key witness in the indictment of approximately fifteen people on various drug-related charges. Among those under indictment were Tyrone McGhee and Jermaine Jelks. Calvin Davis, who died on June 1, 1996, was also one of the persons under indictment. Calvin had suspected that Arnett was primarily responsible for his indictment on five counts of drug trafficking.
Shortly after 6:00 in the morning on May 10, 1994, Arnett's body was found face down on a farm access road off of Dingman-Slagle Drive, Shelby County, Ohio. An autopsy revealed that Arnett had been shot twice in the side of the face, once in the back of the head, and once in the right breast, the right shoulder, and the lower back. There was also evidence of other blunt force trauma to her head. According to the coroner's report, the apparent cause of death was the gunshot wounds to the head.
A toxicology report indicated that cocaine and alcohol were present in Arnett's blood and urine. At trial, it was established that hair samples taken from Arnett's clothing were similar to hair samples taken from appellant. Lisa Forman, a DNA scientist, testified that appellant could have been the source of the hair found on Arnett. Vaginal and rectal swabs also showed the presence of semen. Forman testified that to a reasonable degree of scientific certainty it was appellant's sperm on the swabs.
In December of 1995, Scott Smith and his son, while walking through a section of woods near Dingman-Slagle Drive, found a Smith Wesson .38 caliber revolver near the base of a tree. Upon inspecting the revolver, the police discovered that a screw was missing from the handle. Further examination of the revolver revealed that bullets recovered from the scene of the crime were consistent with having had been fired from a gun of that caliber and type.
It was established at trial that on or about May 2, 1994, Calvin Davis sent appellant a bus ticket to come to Shelby County, Ohio from Georgia. Appellant knew Calvin and his wife, Jewel (also Arnett's sister), from their past travels together as gypsy painters. While in Ohio, appellant stayed at the Davis's home.
Jermaine Jelks testified that sometime in May of 1994, he, Calvin, appellant, and Tyrone McGhee were present in Calvin's van when Calvin told them that, because of their pending drug cases, they should pay appellant to murder Arnett. At one point Jelks testified that McGhee left the van, obtained a large amount of cash wrapped in rubber bands and packed in a duffel bag, and gave the bag to appellant who proceeded to count it.
At trial, Elizabeth Johnson, a friend of the Davis's, testified that sometime in November or December of 1993 Calvin told her that Arnett had set him up. Johnson testified that Calvin was enraged and that Calvin had told her that "before he gave her any more fuckin' money, he'd have her killed or kill her himself."
The State also introduced evidence that Annette Simmons, while visiting the Davis's home, overheard appellant ask Calvin whether he had "the picture." According to Simmons, Jewel Davis then went to the dining room, opened a photo album, and took out a picture. Simmons testified that the picture contained two females. Prior to handing the photograph to Calvin, Jewel tore the picture in half and gave one-half to Calvin, who then put it into his pocket, and she threw the other half away. Simmons testified that the photograph was that of Wilma Arnett.
Jewel Davis testified at trial that Calvin owned the gun with the missing screw. Jewel also testified that on May 9, 1994, the day before Arnett's body was discovered, Calvin handed that same gun to appellant. Jewel testified that Calvin obtained a picture of Arnett and Jewel and disposed of the half showing Jewel. Jewel testified that Calvin showed the other half of the photograph to appellant and then put it into his pocket.[2]
On May 9, 1994, the day before Arnett's body was discovered, Tanya Counts, a cashier at a Speedway gas station, observed Arnett three times throughout the evening. Counts was working the 4:00 p.m. to closing shift. Counts testified that the store usually closed around 10:00 or 11:00 at night. Close to the end of Counts's shift, Arnett returned to the store for the last time that evening to purchase gas. After pumping the gas, Counts observed Arnett return to her car. According to Counts, a tall black male with a "bump" on his eye paid for the gas. It was established at trial that appellant, at the time of Arnett's death, had a large cyst under his right eye. Counts testified that the location of the cyst in a photograph of appellant shown at the trial was in the same place as the cyst on the person she saw with Arnett on the night of the 9th of May, 1994. Counts also testified that the photograph of appellant looked like the same person she saw on the evening of the 9th of May, 1994.
On or about 12:00 a.m. on the 10th of May, 1994, while driving home from a night class, Brent Klauss observed a car parked on the side of Dingman-Slagle Road. At trial, Klauss, after having observed a photograph of Arnett's car, testified that the vehicle he saw on the morning of the 10th of May, 1994 appeared to be the same vehicle as the vehicle in the photograph. Klauss testified that he observed what appeared to be one person in the car, but that he could not entirely recollect whether he saw more than one person.
At trial Tyrone McGhee testified that at approximately 12:30 in the morning on May 10, 1994, while drinking and playing pool at Walleyes Tavern, he observed appellant enter the bar and approach Calvin Davis. McGhee overheard appellant tell Calvin that "[t]he snitch is no more" and that "the bitch was hard to die." McGhee also testified that appellant told Calvin that he shot Arnett once and, because she wasn't dead the first time, had to shoot her again. Further, appellant told Calvin he had beaten Arnett. Appellant also said that he had gotten rid of the weapon by disposing of it in the woods.
Jewel Davis testified that at approximately 3:30 a.m. on May 10, 1994, appellant and Calvin came home intoxicated and then proceeded to bed. According to Jewel, the next morning Calvin was paranoid and nervous.
Paul Smith, Calvin's friend, testified that on the morning of May 10, 1994, the day Arnett's body was discovered, Calvin told Smith that appellant had stolen Calvin's drugs and cash and that he wanted Smith to remove appellant from his home. Smith proceeded to drive appellant into town whereupon appellant then asked Smith to take him to the bus station in Lima, Ohio. When they arrived in Lima, the bus station was closed. Therefore, Smith checked appellant into a motel room. Appellant told Smith to inform only Calvin of his whereabouts.
Jewel Davis testified that approximately three or four days after her sister's death, Calvin told her that he paid appellant $5,000 to kill Arnett. Further, Vance Short testified that, while incarcerated in the Shelby County jail with appellant, appellant told Short that "I made sure that the bitch got what she deserved."
Appellant was eventually charged with the aggravated murder of Arnett, as well as conspiracy to commit aggravated murder. A jury found appellant guilty of one count of aggravated murder, along with the two death penalty specifications, and one count of conspiracy to commit aggravated murder.
At the penalty phase of the trial, the jury recommended that appellant be sentenced to death. The trial court adopted the jury's recommendation. The trial court also sentenced appellant to an additional consecutive term of seven to twenty-five years of confinement for conspiracy to commit aggravated murder.
Upon a thorough review of the record, and for the reasons stated below, we affirm appellant's conviction for aggravated murder, but reverse his conviction for conspiracy to commit murder.
I. PRETRIAL ISSUES
 Assignment of Error No. 13
 The trial court erred when it refused to grant the defendant's motion for a change of venue.
Appellant contends that the trial court erred in failing to grant his motion for a change of venue. Specifically, appellant asserts that extensive news coverage and widespread media exposure to the events surrounding the murder of Wilma Arnett and appellant's alleged involvement in the murder violated his right to an impartial jury and a fair trial. We disagree.
Crim.R. 18(B) and R.C. 2901.12(K) provide for a change of venue when it appears that a fair and impartial trial cannot be held in the county where a cause is pending. In reviewing a ruling on a change of venue motion, the crucial issue is whether the trial court's refusal to change venue violated the defendant's fair trial rights. State v. Lundgren (1995),73 Ohio St.3d 474, 479. The Supreme Court of Ohio has stated in relevant part:
 A change of venue rests largely in the discretion of the trial court, and there are numerous cases holding that appellate courts should not disturb the trial court's ruling on a motion for a change of venue in a criminal case unless it is clearly shown that the trial court has abused its discretion.
State v. Fairbanks (1972), 32 Ohio St.2d 34, 37, citing Statev. Laskey (1968), 13 Ohio App.2d 91, affirmed, 21 Ohio St.2d 187. Further, the Court in Fairbanks held that:
 [N]ewspaper accounts and radio broadcasts of a factual nature and without distortion, or which are noninflammatory in character, do not establish the impossibility of a defendant to have a fair and impartial trial where jurors have not read or heard the reports or such prospective veniremen have testified on voir dire that they will judge the defendant solely on the law and evidence presented at trial.
(Emphasis sic.) Id. at 37. It is also well established that " '[t]he examination of jurors on their voir dire affords the best test as to whether prejudice exists in the community against the defendant * * *.' " (Emphasis sic.) State v. Maurer
(1984), 15 Ohio St.3d 239, 250-251, quoting State v. Swiger
(1966), 5 Ohio St.2d 151, paragraph one of the syllabus.
The Supreme Court of Ohio in State v. Thomson (1987), 33 Ohio St.3d 1,5 held that "[i]n making this decision [on a motion for a change of venue], the trial court should scrutinize closely the voir dire examination of prospective jurors. An important consideration in deciding whether pre-trial publicity has acted to prevent the defendant from having a fair trial is whether a '* * * juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court * * *.'Irvin v. Dowd (1961), 366 U.S. 717, 723." (Emphasis sic.).
In the present case, appellant asserts that "[t]he press and people of Shelby County were so obsessed with this case that it was impossible to seat a fair and impartial jury from this community." A review of the record, however, shows that the trial court conducted extensive voir dire proceedings encompassing approximately three days. Further, the trial court questioned each prospective juror individually on the issues of pretrial publicity and the death penalty.
During the individual voir dire, the trial judge informed each prospective juror that it was of the utmost importance that appellant obtain a fair and impartial jury in the case — one that has not been influenced by any pretrial publicity. The trial judge then questioned the prospective jurors individually as to whether or not they had heard or read anything about the case and, if so, whether they had formed any preconceived opinions about the case which they could not set aside. The trial judge also inquired of each prospective juror whether any knowledge of the incident would influence his or her judgment in the case.
In our view, the responses from all of the jurors clearly complied with the standards enunciated in Thompson and Maurer,supra, concerning pretrial publicity. Although the vast majority of the potential jurors had heard or read something about the case through the media or word of mouth, they indicated that they possessed little knowledge of the incident, held no preconceived opinions about the case which they could not set aside, and would render a verdict based upon the evidence presented at trial. The trial court's reliance on the truthfulness of the jurors's responses was not, in our opinion, an abuse of discretion.
Accordingly, appellant's thirteenth assignment of error is overruled.
Assignment of Error No. 14
 Errors that occurred during voir dire denied appellant Yarbrough a fair and impartial jury. U.S. Const. Amends. VI, VIII and XIV.
Appellant asserts that numerous errors committed by the trial court during voir dire prejudiced his right to a fair and impartial jury. Specifically, appellant asserts that: (1) the trial court erred in conducting group voir dire on all questions except pretrial publicity and the death penalty; (2) the group voir dire failed to elicit honest responses from the prospective jurors and that questions and answers during the group voir dire prejudiced the members of the jury panel; (3) the trial court erred in allowing the use of peremptory challenges to exclude jurors who expressed some reservations about capital punishment; (4) the service of juror Myers, who expressed a strong preference for the death penalty, violated appellant's right to a fair and impartial jury; and (5) the trial court erred in failing to strike the panel of jurors drawn for appellant's case. For the reasons that follow, we disagree.
Appellant initially contends that the trial court erred in conducting group voir dire on all questions except pretrial publicity and the death penalty. Appellant suggests that "[his] right to an impartial jury in a capital case was violated when the trial court denied his motion for individual sequestered voir dire."
The Supreme Court of Ohio addressed the issue of individual voir dire in State v. Landrum (1990), 53 Ohio St.3d 107, 117, where the Court determined that "[n]either Ohio nor federal law requires individual voir dire. That issue is within the discretion of the trial judge." Id. at 117. In the present case, we find that the trial court acted well within its discretion. Therefore, appellant's contention is not well-taken.
Appellant further contends that group voir dire failed to elicit honest responses from the prospective jurors and that questions and answers during the group voir dire prejudiced the members of the jury panel. We find, however, appellant's arguments entirely unfounded and the proposition without merit.
In the present case, on all issues except the death penalty and pretrial publicity, the prospective jurors were voir dired in a group during which time attorneys for both parties were permitted to address the members of the venire with specific questions. There is no evidence before us which indicates that the questions or answers from the prospective jurors prejudiced any member of the jury panel, nor is there any evidence indicating that the group voir dire failed to elicit honest responses from the prospective jurors. Therefore, appellant's contention is not well-taken.
Appellant further maintains that the trial court erred in allowing the use of peremptory challenges to exclude jurors who expressed some reservations about capital punishment. However, the Supreme Court of Ohio in State v. Esparza (1988), 39 Ohio St.3d 8,13-14, held that the use of peremptory strikes against prospective jurors opposed to the death penalty was proper. Apart from excluding jurors based on race or gender, prosecutors can exercise a peremptory challenge for any reason,
without inquiry, and without a court's control. State v. Seiber
(1990), 56 Ohio St.3d 4, 13. Therefore, appellant's proposition is not well-taken.
Appellant further maintains that the service of juror Myers, who expressed a strong preference for the death penalty, violated appellant's right to a fair and impartial jury. We first note that appellant's failure to object to the service of juror Myers waives the right to appeal the issue. Therefore, we may not reverse absent plain error. Crim.R. 52(B); State v.Long (1978), 53 Ohio St.2d 91, 97. The plain error rule should not be invoked unless, but for the error, the outcome of the trial would clearly have been different. See State v. Biros
(1997), 78 Ohio St.3d 426, 436; State v. Wogenstahl (1996),75 Ohio St.3d 344,357.
R.C. 2313.42(J) clearly contemplates that "good cause" exists for the removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." See, also, State v. Allard (1996), 75 Ohio St.3d 482, 493-494. Additionally, a prospective juror who has been challenged for cause should be excused "if the court has any doubt as to the juror's being entirely unbiased." R.C. 2313.43; Allard, supra,
at 493-494.
In the present case, juror Myers, in referring to her belief in the death penalty, stated that she possessed "a strong opinion about it."[3] Juror Myers, however, never stated that she would automatically impose the death penalty. In fact, Myers indicated that she would find it difficult to recommend a death sentence.[4] Further, juror Myers stated during voir dire that she could set her personal feelings aside and follow the trial judge's instructions in the case. For these reasons, the service of juror Myers was appropriate. Therefore, appellant's assertion is not well-taken.
Finally, appellant maintains that the trial court erred in failing to strike the panel of jurors drawn for the case. Specifically, appellant asserts that the exclusive use of voter registration lists in the jury selection process deprived him of an impartial jury representing a fair cross-section of the community.
It is well settled that the utilization of voter rolls alone to choose prospective jurors is constitutional. See, e.g.,State v. Johnson (1972), 31 Ohio St.2d 106, paragraph two of the syllabus; State v. Hill (1992), 64 Ohio St.3d 313, 325-26. Further, appellant has not demonstrated an unfair lack of representation of African Americans in Shelby County juries, nor has he shown that such alleged under-representation resulted from a systematic exclusion by the State of Ohio of that particular group. See State v. Puente (1982), 69 Ohio St.2d 136,138.
Therefore, for the reasons aforementioned, appellant's contention lacks merit.
Accordingly, appellant's fourteenth assignment of error is overruled.
II. TRIAL ISSUES[5]
 Assignment of Error No. 1
 The trial court deprived appellant Yarbrough his right to confront witnesses against him in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as Article I, §§ 9, 10, and 16 of the Ohio Constitution.
Appellant asserts that the trial court committed reversible error in allowing into evidence incriminating statements made by Calvin Davis to Elizabeth Johnson, Jewel Davis, and Jermaine Jelks. Appellant asserts that the statements are hearsay and, therefore, are not admissible into evidence. We disagree.
It is well established that " '[h]earsay' is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Such hearsay is not admissible except as provided by, inter alia, constitutional law and as otherwise provided by law. Evid.R. 802. Further, "hearsay evidence is not admissible 'unless subject to a relevant exception.' " State v. Branham (1995), 104 Ohio App.3d 355,358, quoting State v. Steffen (1987), 31 Ohio St.3d 111,119. We must now inquire into whether the trial court acted properly in admitting into evidence the incriminating statements made by Calvin Davis to Elizabeth Johnson, Jewel Davis, and Jermaine Jelks.
A. Testimony of Elizabeth Johnson
Appellant asserts that the trial court erred in allowing into evidence the testimony of Elizabeth Johnson. We disagree.
Johnson testified at trial that Calvin Davis told her that before he gave Arnett any more money he would have her killed or kill her himself.[6] Upon hearing the arguments of counsel, the trial court allowed the testimony into evidence based upon Evid.R. 803(3), the state of mind exception to the hearsay rule, and Evid.R. 804(B)(3), the statement against interest exception to the hearsay rule. For the following reasons, we find that Calvin Davis's statement was properly admitted into evidence.
Evid.R. 803(3), the state of mind exception to the hearsay rule, creates an exception for the following statements:
 Then existing, mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.
(Emphasis sic.) Evid.R. 803(3) may be used to introduce statements showing the forward-looking intent of the declarant for the purpose of proving that he later acted in accordance with that intent. State v. Tanner (1993), 90 Ohio App.3d 761,772, citing Steffen, 31 Ohio St.3d at 120.
The statement at issue in the present case was evidence of Calvin's intent and motive. Upon careful consideration, we find that Calvin's statement falls within the parameters of the state of mind exception to the hearsay rule.[7]
Appellant further maintains that the statement holds little or no probative value, is highly prejudicial, and is also irrelevant. We first note that the decision whether to admit or exclude evidence rests within the sound discretion of the trial court. State v. Hymore (1967), 9 Ohio St.2d 122, 128 certiorari denied, Hymore v. Ohio (1968), 390 U.S. 1024.
It is well established that in order to be admissible, all evidence must be relevant. Evid.R. 402. Relevant evidence is any evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. Upon a review of the record, we find that the statement is certainly relevant to the facts at issue.
Appellant further maintains that the statement was made at a time too remote from the date of the killing. Therefore, appellant contends, the statement holds little or no probative value and is highly prejudicial. In determining the admissibility of evidence, remoteness has often been considered a factor. 1 Gianelli Snyder, Evidence (1996) 213, Section 403.4. Remoteness is a factor to be used in determiningprobative value. Gianelli Snyder, supra, at 213. "Relevant evidence may be excluded on the grounds of remoteness because of its low probative value." Hamm v. McCarty (1988), 61 Ohio App.3d 623,627; see, also, 1 Weinstein's Evidence (1988) 401-45, Section 401[06].
The Supreme Court of Ohio in Whiteman v. State (1928),119 Ohio St. 285, 298 has held that it is within the province of the court to determine whether testimony is too remote. Thus, the trial court's decision may be viewed as a matter within its discretion under Evid.R. 403. McCarty, supra, at 627. Pursuant to Evid.R. 403, a trial court must exclude any relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
Appellant urges this court to follow the rationale of the Tenth District Court of Appeals in State v. Dickinson (Dec. 2, 1993), Franklin App. No. 93AP-358, unreported. The court inDickinson held that conversations which had taken place betweensix months to two years before the victim's death were too remote in time to be probative of any fact in issue.
In the present case, Johnson testified that she had the pertinent conversation with Calvin sometime in November or December of 1993. Arnett's body was found on the morning of May 10, 1994. Thus, according to Johnson's testimony, at its most remote point in time, the conversation had taken place onlysix months prior to Arnett's death.
Calvin's statement to Johnson was also consistent with the subsequent plan and scheme to kill Arnett. Appellant's threatening statements about Arnett six months prior to her murder are highly relevant and probative of the facts at issue. Thus, we find no error in the trial court's evidentiary ruling because, when balanced, the relevancy and probative value of this testimony far outweigh any arguable prejudice suffered by appellant. Therefore, Calvin's statement, for purposes of admissibility, was not made too remote in time from Arnett's death. Accordingly, Calvin Davis's statement was properly admitted into evidence.
B. Testimony of Jewel Davis and Jermaine Jelks
Appellant maintains that the trial court erred in allowing into evidence incriminating statements made by Calvin Davis to Jewel Davis and Jermaine Jelks. We disagree.
Jewel testified that her husband, Calvin Davis, had told her that he paid appellant $5,000 to kill Arnett.[8] Upon hearing the arguments of counsel, the trial court allowed Calvin's statement into evidence based upon Evid.R. 804(B)(3), the statement against interest exception to the hearsay rule, and Evid.R. 801(D)(2)(E), as a statement by a co-conspirator.
Appellant further maintains that the trial court erred in allowing into evidence the incriminating statement made by Calvin Davis to Jermaine Jelks. Jelks testified that Calvin suggested paying appellant to kill Arnett.[9] Upon hearing the arguments of counsel, the trial court allowed the statement into evidence based upon Evid.R. 804(B)(3), the statement against interest exception to the hearsay rule, Evid.R. 801(D)(2)(E), as a statement by a co-conspirator, and Evid.R. 801(D)(2), as an admission of a party opponent. For the following reasons, we find that the statements made by Calvin Davis to Jewel Davis and Jermaine Jelks were properly admitted into evidence by the trial court.
The decision whether to admit or exclude evidence rests within the sound discretion of the trial court.Hymore, 9 Ohio St.2d at 128, certiorari denied, Hymore v. Ohio
(1968), 390 U.S. 1024. The Confrontation Clause is a constitutional safeguard that ensures a defendant will not be convicted based on the charges of unseen, unknown, and unchallengeable witnesses. Lee v. Illinois (1986),476 U.S. 530, 540. Thus, the Confrontation Clause bars the admission of some evidence that would otherwise be admissible under a hearsay exception. Idaho v. Wright (1990), 497 U.S. 805, 814.
When a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause requires a showing that he is unavailable and that the statement bears adequate "indicia of reliability." Ohio v. Roberts (1980), 448 U.S. 56, 66. The reliability standard can be satisfied without more in a case where the evidence falls within a firmly rooted hearsay exception. Id. at 66. Otherwise, to satisfy the Confrontation Clause the evidence must be supported by a showing of a "particularized guarantee of trustworthiness." Id.
In the present case, the State contends that Calvin Davis's statements are admissible pursuant to Evid.R. 804, which provides:
 (B) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 * * *
 (3) Statement against interest. A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
(Emphasis sic.) Thus, pursuant to Evid.R. 804(B)(3), a statement may be admitted into evidence if the declarant is unavailable and it is a statement against interest. State v.Gilliam (1994), 70 Ohio St.3d 17, 20. To qualify as a statement against interest, it must be shown that the statement tended to subject the declarant to criminal liability so much so that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true.Gilliam, supra, at 20; United States v. Garcia (C.A.7, 1990),897 F.2d 1413, 1420.
Initially, we note that Calvin Davis died on or about June 1, 1996. Therefore, he was unable to testify at trial and the "unavailability" requirement of Evid.R. 804 has been met. Further, Calvin's statements to Jewel Davis and Jermaine Jelks tend to subject him to criminal liability and a reasonable person in his position would not have made the statements unless he believed them to be true. Finally, we must determine whether sufficient corroboration as to the trustworthiness of the statements has been established.
The determination of whether sufficient corroborating circumstances exist generally rests within the sound discretion of the trial court. Landrum, 53 Ohio St.3d at 114. In determining whether sufficient corroboration has been established, the trial court should consider the entire context in which the declaration was made. Weissenberger's Ohio Evidence (1998) 521, Section 804.54, citing 4 Weinstein's Evidence 804-805, Section 804(b)(3)[03].
A thorough review of the record reveals that Calvin's statements to Jewel Davis and Jermaine Jelks were sufficiently trustworthy. We first note that the testimony of several other witnesses is consistent with what the declarant, Calvin Davis, told his wife, Jewel Davis, about the death of Wilma Arnett. Further, the testimony of Jermaine Jelks is consistent with the testimony of other witnesses, as well as the circumstances surrounding Arnett's death.
For these reasons, we find that the testimony of Jermaine Jelks and Jewel Davis was sufficiently corroborated by the other evidence adduced at trial. The context in which the statements were made and other consistent evidence introduced at trial render the statements sufficiently trustworthy. Therefore, pursuant to the statement against interest exception to the hearsay rule, they were properly admitted into evidence by the trial court.[10]
Accordingly, appellant's first assignment of error is overruled.
Assignment of Error No. 2
 The trial court violates the accused's right to compulsory process under the Sixth and Fourteenth Amendments to the United States Constitution when it excludes evidence that tends to show someone other than the accused committed the crime in a capital trial for aggravated murder. The exclusion of such evidence also violates the accused's right to due process under the Fourteenth Amendment to the United States Constitution.
Appellant contends that the trial court erred in failing to allow Kenneth Henderson to testify at trial. Specifically, appellant asserts that Calvin Davis's statement to Henderson that Tyrone McGhee, Jermaine Jelks, and Darren Taborn had come to his house on the morning of the 10th of May, 1994 to clean blood off of themselves should have been admitted into evidence by the trial court.[11]
Appellant asserts that the statement is admissible pursuant to Evid.R. 804(B)(3), the statement against interest exception to the hearsay rule. For the following reasons, we disagree.
It is well established that the decision whether to admit the hearsay statement of an unavailable declarant pursuant to Evid.R. 804(B)(3) is one within the discretion of the trial court. See Landrum, 53 Ohio St.3d at 114. Again, we note that Calvin Davis was unavailable to testify at trial. Therefore, the "unavailability" requirement of Evid.R. 804 has been met. Pursuant to Evid.R. 804(B)(3), the statement must be so far tended to subject the declarant to civil or criminal liability that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true.
In the present case, we cannot in good conscience say that Calvin Davis's statement so far tended to subject him to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true. Calvin's statement was clearly and unequivocally offered as exculpatory evidence; that is, evidence of his innocence and non-participation in the crime. In looking at the context and the totality of the surrounding circumstances in which the statement was made, we decline to find that at the time of its making it so far tended to subject him to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true.
We also note that a statement tending to expose the defendant to criminal liability, whether offered to exculpate or inculpate the accused, is inadmissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. Evid.R. 804(B)(3). Again, the determination of whether sufficient corroborating circumstances exist generally rests within the sound discretion of the trial court.Landrum, supra, 53 Ohio St.3d at 114.
Although Tyrone McGhee and Jermaine Jelks were under indictment for drug trafficking and Arnett was the principal witness for the State, there was no other credible evidence adduced at trial to corroborate the statement's trustworthiness. Therefore, we find that the trial court acted within its discretion in refusing to admit the statement into evidence.
Accordingly, appellant's second assignment of error is overruled.
Assignment of Error No. 3
 Mr. Yarbrough's conviction and sentence are against the manifest weight of the evidence and therefore in violation of his rights under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution as well as Article I, §§ 9, 10, and 16 of the Ohio Constitution.
Appellant asserts that his conviction is against the manifest weight of the evidence.[12] We disagree.
The Supreme Court of Ohio has held that in determining whether a verdict is against the manifest weight of the evidence, appellate courts shall:
 [Review] the entire record, [weigh] the evidence and all reasonable inferences, [consider] the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, citing Statev. Martin (1983), 20 Ohio App.3d 172, 175. The Court inThompkins also cautioned appellate court to use discretion and only reverse convictions in extraordinary cases where the evidence clearly weighs in favor of reversal. Id. at 387.
Appellant was convicted of the aggravated murder of Wilma Arnett — the offense having been committed for hire and to prevent her from testifying at a criminal proceeding. On the charge of aggravated murder, the State had the burden of proving beyond a reasonable doubt that appellant "purposely, and with prior calculation and design, cause[d] the death of another[.]" R.C. 2903.01(A).
Upon a careful and thorough review of the record, we find that the weight of the evidence supports the jury's conviction on the charge of aggravated murder. The testimony of numerous witnesses as well as the other evidence adduced at trial supports the jury's finding of guilt.[13] Consequently, we support the jury's conclusion. Therefore, appellant's contention is not well-taken.
Accordingly, appellant's third assignment of error is overruled.
Assignment of Error No. 4
 The trial court erred in submitting charges of aggravated murder and conspiracy to commit aggravated murder to the jury. The trial court further erred in sentencing appellant Yarbrough on both counts. U.S. Const. Amends. V and XIV.
Appellant asserts that separate convictions for aggravated murder and conspiracy to commit murder violate his rights pursuant to the Fifth Amendment Double Jeopardy Clause and theFourteenth Amendment Due Process Clause of the United States Constitution. Specifically, appellant asserts that the trial court erred in allowing appellant to be convicted on the separate charges of aggravated murder and conspiracy to commit aggravated murder. Further, appellant asserts that the wrongful conviction for conspiracy to commit aggravated murder prejudiced him during the penalty phase of the trial. Therefore, appellant argues, this Court must set aside his sentence of death. We agree with appellant's argument that he was wrongly convicted on the charge of conspiracy to commit aggravated murder, but we decline to set aside his sentence of death.
Appellant concedes that he failed to file a timely objection to his conviction for conspiracy to commit aggravated murder. Therefore, our focus in ruling on this assignment of error is limited to determining whether the trial court committed plain error. Crim.R. 52(B); Long, 53 Ohio St.2d at 97.
We first note that "[a] 'judgment of conviction' is defined as including both a plea or verdict of guilty and the imposition of sentence." (Emphasis added.) State v. Dapice
(1989), 57 Ohio App.3d 99, 102; citing State v. Henderson
(1979), 58 Ohio St.2d 171, 179. The Double Jeopardy Clause of the United States Constitution protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple prosecutions for the same offense. North Carolina v. Pearce
(1969), 395 U.S. 711, 717. The Ohio Constitution also protects against double jeopardy in Section 10, Article I, which reads: "No person shall be twice put in jeopardy for the same offense."
The United States Supreme Court has held that "the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses" not subject to a double jeopardy plea. Pinkerton v. United States (1946), 328 U.S. 640,643; see, also, United States v. Felix (1992) 503 U.S. 378,390-391 (holding that a substantive crime and a conspiracy to commit that crime are separate offenses for double jeopardy purposes); Katz Gianelli (1996) 551, Section 73.4. Further, the protection afforded by the two constitutions is substantially similar and a prosecution which satisfies the United States Constitution will not violate the Ohio Constitution. See State v. Thomas (1980), 61 Ohio St.2d 254,259-260.
In the present case, appellant was convicted of the substantive offense of aggravated murder. Appellant was also convicted of conspiracy to commit aggravated murder. Pursuant to the United States Supreme Court's holdings in Felix andPinkerton, supra, and the Supreme Court of Ohio's holding inThomas, supra, appellant's convictions for aggravated murder and conspiracy to commit murder are separate offenses and do not violate his constitutional rights pursuant to the Double Jeopardy Clause or Due Process Clause of the Ohio and United States Constitutions.
We also note that R.C. 2941.25(A) provides in pertinent part:
 Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
The proper test for applying the "Multiple counts" statute is set forth in City of Newark v. Vazirani (1990), 48 Ohio St.3d 81. The syllabus in this case provides in pertinent part:
 [A] two-tiered test must be undertaken to determine whether two or more crimes are allied offenses of similar import. In the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step. In the second step, the defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses.
(Emphasis sic.) Pursuant to the test set forth by the Supreme Court of Ohio in Newark, the court must first compare the elements of the two offenses. Upon doing so, it is clear that the crimes of aggravated murder and the crime of conspiracy to commit aggravated murder are not allied offenses of similar import within the meaning of R.C. 2941.25(A). The elements of proof of each crime do not correspond to such a degree that the commission of the one offense will result in the commission of the other.
R.C. 2923.01(G), however, provides in pertinent part:
 When a person is convicted of committing or attempting to commit a specific offense * * * the person shall not be convicted of conspiracy involving the same offense.
(Emphasis added.) Although the crimes of aggravated murder and conspiracy to commit aggravated murder do not constitute crimes of similar import within the meaning of R.C. 2941.25(A), it is clear that the legislature intended that a person convicted of aggravated murder shall not be convicted of a conspiracy involving that same offense.
In the present case, appellant was convicted of the specific offense of aggravated murder. Therefore, a conviction for conspiracy to commit aggravated murder is clearly barred by R.C. 2923.01(G).
For the reasons aforementioned, appellant's conviction for conspiracy to commit aggravated murder constitutes plain error and is hereby reversed. We decline, however, to set aside appellant's sentence of death. There is no evidence before us which supports appellant's proposition that his conviction for conspiracy to commit aggravated murder prejudiced him during the penalty phase of the trial.
Accordingly, appellant's third assignment of error is well-taken with respect to the wrongful conviction for conspiracy to commit aggravated murder, but is overruled with respect to his sentence of death.
Assignment of Error No. 5
 Errors and omissions in the instructions during the trial phase of appellant Yarbrough's capital trial deprived him of due process of law. U.S. Const. Amends. V, VI, VIII and XIV.
Appellant asserts that errors and omissions during the instruction phase of the trial deprived him of his rights to due process of law. Specifically, appellant contends that: (1) the trial court erred in failing to define for the jury the elements contained within the two death penalty specifications; (2) the trial court's definition of "reasonable doubt" violated his due process rights under the Fourteenth Amendment to the United States Constitution; and (3) the trial court erred in defining for the jury "purpose" and "intent" — essential elements of the crime of aggravated murder. For the following reasons, we disagree.
We first note that appellant failed to file a timely objection to the trial court's jury instructions as required by Crim.R. 30(A). Crim.R. 30(A) governs jury instructions and provides in pertinent part:
 On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection.
The law is well established in Ohio that a failure to object before the jury retires constitutes a waiver in accordance with Crim.R. 30(A). See, e.g., State v. Williford (1990), 49 Ohio St.3d 247,251. In State v. Underwood (1983), 3 Ohio St.3d 12, the Supreme Court of Ohio held that the failure to object to a jury instruction results in the waiver of any associated error absent plain error. We must therefore evaluate each of appellant's claimed errors pursuant to the plain error rule.
Appellant initially asserts that the trial court erred in failing to define for the jury the elements contained within the two applicable death penalty specifications. The applicable death penalty specifications at issue are: (1) murder for hire in violation of R.C. 2929.04(A)(2), and (2) murder of a criminal witness in violation of R.C. 2929.04(A)(8). R.C.2929.04(A) provides in pertinent part:
 Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:
 * * *
 (2) The offense was committed for hire;
 * * *
 (8) The victim of the aggravated murder was a witness to an offense who was purposely killed to prevent his testimony in any criminal proceeding[.]
A settled principle of statutory construction is that words in a statute are to be given their plain and ordinary meaning unless it is otherwise clearly indicated. Crane v. Commr. ofInternal Revenue (1947), 331 U.S. 1, 6; Lake Cty. Natl. Bank v.Kosydar (1973), 36 Ohio St.2d 189, 191. Regardless of the policy implications, plain and unambiguous language may not be ignored. Board of Edn. v. Fulton Cty. Budget Comm. (1975),41 Ohio St.2d 147, 156. Further, the Supreme Court of Ohio inKneisley v. Lattimer-Stevens Co. (1988), 40 Ohio St.3d 354, 357
explained that "[a]bsent ambiguity, statutory language is not to be enlarged or construed in any way other than that which its words demand." See, also, Hough v. Dayton Mfg. Co. (1902),66 Ohio St. 427, 436-437.
Upon a review of R.C. 2929.04, we find nothing ambiguous, vague, or unclear about the elements of the death penalty specifications at issue in the present case. The plain and ordinary meaning of the specifications are obvious and apparent; there are no words open to interpretation. The trial court has no duty to define statutory language that has a plain and ordinary meaning. Further, we cannot say that but for the trial court's failure to define the elements of each specification, the jury would not have found the death penalty specifications proved beyond a reasonable doubt. Therefore, appellant's contention is not well-taken.
Appellant further maintains that the trial court's definition of "reasonable doubt" violated his due process rights under theFourteenth Amendment to the United States Constitution. Specifically, appellant asserts that the trial court violated his due process rights in instructing the jury that it could convict upon a standard of proof below proof beyond a reasonable doubt.
The trial court defined reasonable doubt for the jury as follows:
 The Defendant is presumed innocent until his guilt is established beyond a reasonable doubt. The Defendant must be acquitted unless the State produced evidence which convinces you beyond a reasonable doubt of every essential element of the offenses that's [sic] charged in the indictment.
 * * *
 Now, reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is doubt based on reason and common sense. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.
 Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his affairs.
The trial judge's definition of reasonable doubt comports with the definition set forth in R.C. 2901.05. The Supreme Court of Ohio has held that a trial judge's use of the definition of reasonable doubt provided in R.C. 2901.05 is constitutional. See State v. Frazier (1995), 73 Ohio St.3d 323, 330. The Court in Frazier held that "R.C. 2901.05 accurately imparts the concept of reasonable doubt and does not diminish the state's requirement to prove guilt beyond a reasonable doubt." Id. at 330. Therefore, we find that appellant's contention lacks merit.
Finally, appellant maintains that the trial court erred in defining for the jury "purpose" and "intent" — essential elements of the crime of aggravated murder. Specifically, appellant maintains that the trial court's instructions created a "reasonable likelihood" that the State's burden of proof was shifted to appellant.
The trial court defined purpose and intent for the jury as follows:
 Purpose is the decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposefully is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. The purpose with which a person does an act is determined from the manner in which it is done, the means used, and all other facts and circumstances in evidence.
 If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or to inflict great bodily harm, the purpose to cause the death may be inferred from the use of the weapon.
The trial court read the standard jury instruction from Ohio Jury Instructions, 4 Ohio Jury Instructions (1997) 57-58, Section 409.01. It is well settled that a single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge. State v. Price
(1979), 60 Ohio St.2d 136, paragraph one of the syllabus.
In the present case, among the other instructions provided by the trial court was the very clear and unambiguous instruction that "[b]efore you can find the Defendant guilty, you must find beyond a reasonable doubt that * * * the Defendant purposely caused the death of another with prior calculation and design." The trial court further stated:
 Purpose to cause the death of another is an essential element of the crime of aggravated murder. A person acts purposefully when it is his specific intention to cause a certain result. It mustm be established in this case that at the time in question there was present in the mind of the Defendant a specific intention to purposefully cause the death of Wilma Arnett.
The trial court clearly and unambiguously explained to the jury that a person acts purposely when he acts with the specific intent to cause a certain result, i.e., the death of another. Considering the totality of the instructions, it is clear that any defect in the instructions was cured by the trial court's specific instruction that a conviction for the offense of aggravated murder requires proof that the defendant specifically intended to cause the death of the victim.Thompson, 33 Ohio St.3d at 16; State v. Joseph (Dec. 23, 1993), Allen App. No. 1-91-11, unreported, affirmed, 73 Ohio St.3d 450.
In the present case, the trial court's instructions clearly indicated that the jury had to find that appellant specifically intended to cause the death of Wilma Arnett. Therefore, the instructions were proper.
Accordingly, appellant's fifth assignment of error is overruled.
Assignment of Error No. 9
 Prosecutorial misconduct throughout appellant Yarbrough's capital trial denied Yarbrough his due process right to a fair trial. U.S. Const. Amend. XIV.
Appellant contends that his conviction must be reversed due to various instances of prosecutorial misconduct. Specifically, appellant asserts that the prosecutor committed misconduct during closing arguments by: (1) arguing that the defense was unsuccessful in trying to "explain away" the evidence;[14] (2) stating that a lack of evidence was evidence of guilt;[15] and (3) stating to the jury that the standard of "reasonable doubt" was not a difficult burden to overcome.[16] Appellant also contends that the trial court erroneously allowed the prosecutor to misstate the evidence.
A review of the record reveals that appellant failed to object to the first three claims of error. It is well established that in the absence of an objection, we limit our review of the prosecutor's comments to that standard established for plain error. State v. McNeill (1998), 83 Ohio St.3d 438,446; State v. White (1998), 82 Ohio St.3d 16, 22.
The test for prosecutorial misconduct in closing argument is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused.State v. Smith (1984), 14 Ohio St.3d 13, 14. Further, "[t]he closing argument must * * * be reviewed in its entirety to determine if the prosecutor's remarks were prejudicial." Statev. Moritz (1980), 63 Ohio St.2d 150, 157; see, also, State v.Keenan (1993), 66 Ohio St.3d 402, 410.
It is well-settled that remarks made by counsel in opening statements and closing arguments are not evidence. Prior to the commencement of the closing arguments, the trial judge instructed the jury that the arguments of counsel were not evidence. A jury is presumed to follow the instructions given to it by the trial judge. State v. Loza (1994), 71 Ohio St.3d 61,75.
Further, the statements made by the prosecution did not prejudicially affect the substantial rights of the accused. Having conducted a thorough review of the record, we cannot say that but for the comments of the prosecutor the result of the trial would have been different. Therefore, appellant's contentions are without merit.
Appellant further maintains that the prosecutor committed reversible error by misstating to the jury that witness Tanya Counts had placed appellant with the victim on the night of the murder.[17]
In determining whether a misstatement of the evidence during closing argument constitutes reversible error, the relevant inquiry is whether the misstatement "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo (1974), 416 U.S. 637, 643;State v. DePew (1988), 38 Ohio St.3d 275, 287. A review of the transcript reveals that Tanya Counts never made a positive identification of appellant.[18] The prosecutor's comment during this phase of the closing arguments was improper and the trial court erred in overruling appellant's objection. We find, however, that the prosecutor's statement did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. Further, prior to the commencement of the closing arguments, the trial judge instructed the jury that the arguments of counsel were not evidence. For these reasons, appellant's contention is without merit.
In conclusion, we find that appellant received a fair trial in every aspect of his trial and that appellant's assertions of prosecutorial misconduct are without merit.
Accordingly, appellant's ninth assignment of error is overruled.
Assignment of Error No. 15
 A capital defendant is denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eight [sic] and Fourteenth Amendments to the United States Constitutions and Article I, sections 10 and 16 of the Ohio Constitution when the trial court admits evidence which is highly prejudicial, cumulative, repetitive and of little probative value.
Appellant asserts that the trial court committed reversible error in allowing into evidence numerous photographs, autopsy slides, and a videotape of Wilma Arnett's body. Specifically, appellant contends that the photographs, autopsy slides, and videotape are repetitive, gruesome, and lack probative value. For the following reasons, we disagree.
We first note that appellant failed to object to the admission of the photos and videotape into evidence. Appellant's failure to object waives the right to appeal the issue. Therefore, we may not reverse absent plain error. Crim.R. 52(B); Long, 53 Ohio St.2d at 97. A review of the record reveals that appellant did object to the admission of the autopsy slides into evidence. Therefore, appellant has preserved the issue for appeal.
The Supreme Court of Ohio in Maurer, 15 Ohio St.3d at 266, held that nonrepetitive photographs in capital cases, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to the accused. A trial court's decision to admit photographs of the victim's injuries will be upheld absent an abuse of discretion.State v. Slagle (1992), 65 Ohio St.3d 597, 602.
In the case sub judice, although portions of the videotape as well as several of the photographs may be gruesome, their probative value substantially outweighs any danger of unfair prejudice. The photographs and videotape are relevant in depicting the crime scene and illustrative of the coroner's autopsy report and other testimony at trial. Further, the photographs, videotape, and autopsy slides are helpful in determining the location of the wounds on Arnett, the various angles of penetration, and the condition of Arnett's body shortly after removal from the crime scene. Therefore, we find that the probative value of the photographs, videotapes, and autopsy slides greatly outweigh any unfair prejudice.
Although the use of the videotape as well as the photographs may have been cumulative and repetitive, we cannot say that but for their admission into evidence, the result of the trial would have been different. Further, we find that any error in the admission of both the videotape and photographs into evidence was harmless beyond a reasonable doubt. It is well settled that a nonconstitutional error is harmless if there is substantial other evidence to support the verdict. State v.Webb (1994), 70 Ohio St.3d 325, 335. In the present case, there is substantial other evidence of appellant's guilt.
Accordingly, appellant's fifteenth assignment of error is overruled.
Assignment of Error No. 16
 When the State fails to introduce sufficient evidence of aggravated murder, the resulting conviction deprives a capital defendant of substantive and procedural due process as guaranteed by the Eighth, Ninth, and Fourteenth Amendments of the United States Constitution, as well as Article I, sections 1, 16 and 20 of the Ohio Constitution.
Appellant asserts that the State failed to prove beyond a reasonable doubt the aggravating circumstances contained in R.C. 2903.01.[19] We disagree.
[1] The aggravated murder charge contains two aggravating circumstances, otherwise known as statutory death specifications. First, the offense was committed for hire in violation of R.C. 2929.04(A)(2). Second, the victim was murdered to prevent her from testifying at a criminal proceeding in violation of R.C. 2929.04(A)(8).
[2] It appears from the transcript that Calvin put the picture into his own pocket.
[3] The proceedings of January 8, 1997 reveal the following:
Juror No. 16: "Yes. My opinion is that if they have, they are guilty of killing someone I would prefer that they would have the death sentence over life imprisonment because they could possibly get paroled early and then maybe get out and kill someone again."
[4] The proceedings of January 8, 1997 reveal the following:
Appellant's Counsel: "You're maybe not fearful of this defendant or defendants in general would it be fair to say that maybe you just had some anxiety over participating in this whole process?"
Juror No. 16: "Oh yeah. Yeah. I have anxiety over the thought of participating and getting my points out, not letting myself just to agree with everybody else what they do because I feel I have 1/12 of the decision here. It's a big decision and I would find it very hard to give him the death penalty, but I would try to keep a very open mind. I'd do the best job I could do. I would try to be —."
Appellant's Counsel: "Very conscientious?"
Juror No. 16: "Yeah, too much probably."
[5] In this section we address those errors appellant alleges to have occurred during the guilt phase of his trial as well as any issues in which errors are claimed to have occurred throughout the entire case, i.e., ineffective assistance and rosecutorial misconduct.
[6] The proceedings of January 14, 1997 reveal the following:
State: "You were having conversations with Calvin Davis and Calvin Davis was complaining that Wilma Arnett had set him up?"
Witness: "Yes."
State: "Okay."
State: "And could you describe to us how he felt about that, what his state of mind was?"
Witness: "Enraged."
State: "Okay. How did you know that he was enraged?"
Witness: "Well, he told me. The way he was walkin' around and, you know, complaining about it; and he said he'd go to prison for 15 years, and then he told me it was Jewel's sister."
State: "And Jewel was his wife."
Witness: "Yeah."
State: "Okay."
Witness: "And he picked up my telephone and he told me, I'll show you; and he dialed his phone number in Jackson Center and activated his answering machine and rewound it and let me hear Wilma's voice demandin' more money from him or she was goin' to the police."
State: "Okay. And what was his reaction or response to this phone message on his answering machine?"
Witness: "He was highly upset."
State: "And — and what did he do to indicate to you that he was upset?"
Witness: "He said before he gave her — you want his exact words?"
State: "If you can recall them, yes."
Witness: "He said before he gave her any more fuckin' money, he'd have her killed or kill her himself."
[7] For these reasons, we need not address any other exceptions to the hearsay rule.
[8] The proceedings of January 15, 1997 reveal the following:
State: "Did you have occasion to learn anything later about Kevin Yarbrough's involvement in Wilma Arnett's death?"
* * * Witness: "Yes."
State: "Okay. And can you tell us approximately when?"
Witness: "It was about three or four days later."
State: "And where did you — did you learn this?"
* * *
Witness: "In — at my house in my living room."
State: "Who was there?"
Witness: "It was me and Calvin. At one time John Simmons was there."
State: "Okay. What happened that caused [you] to learn something about Kevin Yarbrough's involvement in Wilma Arnett's death?"
Witness: "Calvin stated that he paid $5,000 to Kevin to have Wilma killed."
[9] The proceedings of January 16, 1997 reveal the following: State: "Okay. Tell me, where did you see Kevin Yarbrough on this time?"
* * *
Witness: "Calvin Davis's van."
* * *
State: "And who all was present in that van at that time?"
Witness: "Calvin Davis; Kevin Yarbrough; my cousin, Tyrone McGhee; and myself."
State: "Okay. What took place in that van?"
Witness: "Conversation about doin' a hit on Wilma Arnett."
State: "Okay."
Witness: "On the previous drug charges that we had."
* * *
State: "Tell us — tell us what happened."
* * *
Witness: "Calvin was speakin' based upon our drug cases and suggested they should do — pay Kevin Yarbrough to do a hit on Wilma."
* * *
Witness: "It was $10,000 apiece."
* * *
State: "All right. Did they say why they wanted Wilma Arnett hit?"
Witness: "Yeah, so our drug cases would get dropped."
[10] For these reasons, we need not address any other exceptions to the hearsay rule.
[11] The in camera proceedings of January 16, 1997 reveal the following:
Appellant's Counsel: "Did he talk to you at all about anything about the night of Wilma Arnett's murder?"
Witness: "Not — he didn't really talk to me. He just talked to me about — he told me that certain people had done it, you know."
Appellant's Counsel: "Okay. What did he tell you exactly?"
Witness: "He told me that Tyrone McGhee and Jermaine Jelks, and Darren Taborn killed Wilma."
Appellant's Counsel: "And what specifically did he say in addition to that, if anything?"
Witness: "He said that — that they came to his house early that morning and cleaned blood off 'em or somethin'. That's what he said."
[12] We will address appellant's conviction for conspiracy to commit aggravated murder in assignment of error No. 4.
[13] We will address whether the State proved beyond a reasonable doubt the aggravated circumstances contained in R.C. 2903.01 in assignment of error No. 16, and whether the State proved beyond a reasonable doubt the death penalty specifications in assignment of error No. 8.
[14] The proceedings of January 17, 1997 reveal the following:
State: "The problem is that the defense is flailing away at every explanation that they can come up with to try to explain away the evidence that we presented to you today. First of all they point to George Arnett, then they point to Tyrone McGhee, then they point to Jermaine Jelks, then they point to people in Dayton who committed the crime. That is because they have all this evidence that they can't — they can't explain away."
[15] The proceedings of January 17, 1997 reveal the following:
State: "Now sometimes the lack of evidence can also be evidence."
* * *
State: "These kind[s] of crimes, premeditated murder, murder for hire, do not lend themselves to a lot of evidence."
[16] The proceedings of January 17, 1997 reveal the following:
State: "Now actually, we all use reasonable doubt every day. We fly in airplanes even though there's the possibility that they may crash. We drive our cars to work even though there's the possibility that there may be an accident. We dress or plan our activities based upon weather forecasts even though those may prove to be wrong."
[17] The proceedings of January 17, 1997 reveal the following:
State: "Yarbrough denies to Joanie Henry being with Wilma that night; and yet we have him seen by Tonya Counts and we have — "
Appellant's Counsel: "Objection."
The Court: "Overruled."
* * *
State: "Again, Joanie Henry testified that Kevin Yarbrough denied to her being with Wilma Arnett that night, but he's seen with her by Tonya Counts."
[18] The proceedings of January 15, 1997 reveal the following: Witness: "He was black, tall, and had a bump on his eye."
State: "Okay."
* * *
State: "Do you see that person in the courtroom today?"
Witness: "I'm not for sure."
* * *
State: "I'm sorry?"
Witness: "I'm not for sure."
* * *
State: "What can you tell me about the photograph?"
Witness: "It's the same place the bump was."
State: "Okay. That's the same place the bump was?"
Witness: (Witness nods her head in the affirmative)
State: "Can you tell whether that's the same person or not?"
Witness: "I'm not for sure."
[19] Appellant also asserts in his assignment of error that there was insufficient evidence that the death penalty specifications were proved beyond a reasonable doubt. We address this